RECEIVED



FEB 07 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

CALVIN P. WILTZ, III                                    CIVIL ACTION NO. 04-2146

VS.                                                             JUDGE MELANÇON

JO ANNE BARNHART, Commissioner          MAGISTRATE JUDGE METHVIN
Social Security Administration

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED**.

### *Background*

Born on February 25, 1985, Calvin P. Wiltz, III ("Wiltz") is a 20-year-old claimant who

has a GED and no past work.[1]  Wiltz applied for childhood supplemental security income

benefits alleging disability as of May 12, 1999 due to migraine headaches, learning problems,

sinusitis, and adjustment disorder.[2]  Wiltz's application was denied on initial review, and an

administrative hearing was held on September 24, 2003.[3]  Because Wiltz had turned eighteen on

February 25, 2003, the ALJ's opinion, issued on May 27, 2004, considered Wiltz's eligibility for

benefits under both the child's standards and the adult standards. The ALJ determined that Wiltz

was not disabled because his impairments do not meet or equal a listing, and there are jobs which

---

[1] At the time of the administrative hearing, Wiltz was preparing to take his GED.

[2] Tr. 54-68.

[3] Tr. 226-245.

exist in significant numbers in the economy which Wiltz could perform.[4]  A request for review

was denied by the Appeals Council and Wiltz filed the instant suit appealing the ALJ's decision.

## *Assignment of Errors*

Wiltz alleges the following errors: 1) the ALJ erred in not finding that his migraine

headaches, sinusitis, and adjustment disorder result in extreme limitations which satisfy the

requirements of a Listed impairment; 2) the ALJ posited a defective hypothetical question to the

vocational expert; and 3) the record does not contain an intelligent or informed waiver of Wiltz's

right to counsel or right to inspect post-hearing evidence, and therefore, the ALJ denied Wiltz

due process of law.

## *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the

Commissioner's decision is supported by substantial evidence in the record; and (2) whether the

decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir.

2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

236 (5th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292;

Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in

the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of

the evidence does not support the Commissioner's conclusion.  Carey, 230 F.3d at 136; Johnson

v. Bowen , 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate

---

[4] Tr. 12-24.

only if no credible evidentiary choices or medical findings exist to support the decision.
Johnson, 864 F.2d at 343.

### ALJ's Decision

As discussed above, since Wiltz turned eighteen during the pendency of this case, the
ALJ evaluated whether he was entitled to benefits under both child and adult disability standards.

## Childhood Disability Benefits

An individual under age 18 may be found disabled "if that individual has a medically
determinable physical or mental impairment, which results in marked and severe functional
limitations, and which can be expected to result in death or which has lasted or can be expected
to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i).

The regulations provide a three-step sequential evaluation process for determining
whether a child's impairments result in "marked and severe limitations." First, if the child is
engaging in "substantial gainful activity," the child will be found not disabled regardless of
medical condition or age, education, or work experience. 20 C.F.R. §416.924(b). Second, the
child must have a severe impairment or impairments. If the child suffers from a slight
abnormality or a combination of slight abnormalities that causes no more than minimal
functional limitations, the child will be considered to have no severe impairment, and therefore to
be not disabled. Title 20 C.F.R. §416.924(c). Third, the child will be considered disabled if his
or her impairment(s) meet, medically equal, or functionally equal in severity a listed impairment
in Appendix 1 of Subpart P of Part 404 of the chapter. If a child's impairments do not meet or
medically equal a listed impairment, the Commissioner will assess all functional limitations
caused by the child's impairments to determine whether the functional limitations are disabling.

4

20 C.F.R. §§ 416.926a (functional equivalence for children). *See, e.g.,* <u>Luckerson v. Apfel</u>, 2000 WL 1222125 (N.D. Ill. Aug. 22, 2000).

The ALJ concluded that Wiltz suffers from the following severe impairments: borderline intellectual functioning and an adjustment disorder. The ALJ further found that these impairments did not meet or functionally equal the requirements of a Listed impairments.[5] Thus, the ALJ determined that Wiltz was not disabled under the regulations for childhood benefits.

## Adult Disability Benefits

A person applying for disability and/or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act, 43 U.S.C. §423(d). Initially, the burden is on the claimant to show that he cannot perform his previous work. <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1301 (5th Cir.1987); <u>Anthony</u>, 954 F.2d at 293. Once the claimant satisfies his initial burden, the Secretary then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is therefore not disabled. <u>Fraga</u>, 810 F.2d at 1301-1302; <u>Johnson v. Bowen</u>, 864 F.2d 340, 344 (5th Cir.1988). In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1.  If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2.  A person who does not have a "severe impairment" will not be found to be disabled.

3.  A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

---

[5] Tr. 16-18.

4.      If a person can still perform his past work, he is not disabled.

5.      If a person's impairment prevents him from performing his past
        work, other factors including age, education, past work experience,
        and residual functional capacity must be considered to determine if
        other work can be performed.

When a mental disability claim is made, the Commissioner utilizes a corollary sequential

procedure for determining the merits of the claim. Essentially, this procedure substitutes

specialized rules at Step 2 for determining whether a mental impairment is severe, and also

provides detailed guidelines for making the Step 3 determination as to whether the mental

impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the
> degree of functional limitation resulting from each in four broad functional areas,
> and determine the severity of each impairment. Furthermore, § 404.1520a(e)
> provides that the ALJ must document his application of this technique to the
> claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed.Appx. 652 (5th Cir. 2002) (unpublished).[6]

---

[6] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa.
2004):

1.      The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to
        determine whether he or she has a medically determinable mental impairment.

2.      If a medically determinable mental impairment is found, the ALJ must then rate the degree of
        functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2)
        social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation.
        See C.F.R. §404.1520a(c)(3).

3.      When a severe mental impairment is found, the Commissioner determines whether the impairment
        meets or exceeds the requirements of the Listings.

4.      When the severe mental impairment does not meet Listing requirements, the Commissioner then
        assesses the claimant's residual functional capacity.

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild,"
and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence
otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.*
Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

In the instant case, the ALJ determined that Wiltz's borderline intelligence and adjustment disorder were severe impairments.[7] The ALJ assessed Wiltz's residual functional capacity ("RFC") and concluded that Wiltz could perform the exertional demands of work at all exertional levels with the following non-exertional limitations: work must be limited to one-step to three-step operations under general supervision with limited interaction with the public.[8] Relying on the testimony of a vocational expert, the ALJ concluded that Wiltz is capable of making an adjustment to work that exists in significant numbers in the national economy, and is therefore not disabled.

### Findings and Conclusions

After a review of the entire record and the briefs of the parties, and pursuant to 42 U.S.C. § 405(g), the undersigned concludes that the ALJ's findings and conclusions are not supported by substantial evidence in the record.

### I.     Administrative Record

### Medical Records

Dr. Rick Matis, a family practitioner, began treating Wiltz in 1998 for headaches.[9]   On November 21, 2000, Wiltz was examined by Dr. Steven Snatic, a neurologist.[10]  Wiltz complained of sinus troubles and repeated headaches.  Wiltz explained that he recently had a headache that was accompanied by vomiting and that he had some type of headache every day,

---

[7] Tr. 19.

[8] Tr. 20.

[9] Tr. 180.

[10] Tr. 118-119.

which resulted in him spending most of the day in a dark room. Additionally, Wiltz's mother advised that she began allowing Wiltz to sleep in her bedroom because he was waking up during the night and crying because of the pain. Dr. Snatic prescribed Atenolol and amitriptyline.[11]

The record shows that Dr. Matis sent medical notes excusing Wiltz from over 24 school days due to headaches, beginning in March, 2001.[12] On November 14, 2001, Dr. Matis completed a form in order for Wiltz to be placed on homebound educational status for 12 weeks due to vascular headaches and sinusitis.[13] On April 10, 2002, Dr. Matis again completed the requisite form for Wiltz to continue homebound schooling for the remainder of the school year due to headaches and sinusitis.[14] Homebound education continued during Wiltz's senior year in 2003.[15] During this time, Wiltz was prescribed Imatrex, Mazsalt, Nasacort, Singulair to relieve his migraine and sinusitis pain.

On September 18, 2002, in addition to severe headaches, Wiltz complained of decreased energy, feelings of guilt and suicidal thoughts.[16] Dr. Matis diagnosed depression and prescribed Lexapro, an anti-depressant.

On August 18, 2003, Dr. Matis summarized his treatment of Wiltz as follows:

Calvin has been followed by this office since 1998. His main health problem has been headaches. He has been diagnosed by Dr. Favian Lugo, a neurologist, with

---

[11] Atenolol is used to treat the circulatory system and amitriptyline is an anti-depressant that can be used to treat pain. *See* www.drugs.com

[12] Tr. 134, 136, 137, 139, 143, 146-149.

[13] Tr. 123.

[14] Tr. 121.

[15] Tr. 180.

[16] Tr. 205.

vascular headaches. He has additional substantial nasal and sinus disease with
perennial and seasonal rhinitis triggering chronic and recurrent sinus infections.
Despite aggressive management efforts, his headaches have progressed to the
point of substantially limiting his activities. He required home schooling his
entire senior year of high school. His condition may improve with continued
management but now, and for the foreseeable future, he is incapacitated by his
disease.[17]

The record does not contain the medical records of Dr. Fabian Lugo referenced in Dr.

Matis's report.

On June 3, 2002, at the request of Disability Determination Services ("DDS"), Wiltz was

examined by Dr. Alfred Buxton, a clinical psychologist.[18] Dr. Buxton administered the

Wechsler Intelligence Scale for Children-III. The scores reflected a verbal IQ of 79, performance

IQ of 73, and full scale IQ of 74. These scores placed Wiltz in the borderline range of

subaverage general intellect.[19] Dr. Buxton noted that Wiltz is sometimes sad because of his

headaches. Dr. Buxton's diagnosis was mild adjustment disorder with depressed mood.

On June 28, 2002, Linda Upton, Ph.D., a non-examining SSA medical consultant,

conducted a Psychiatric Review Technique ("PRT"), a Mental Residual Functional Capacity

Assessment, and complete a Childhood Disability Evaluation Form.[20] Upton concluded that

Wiltz had mild restrictions of activities of daily living and maintaining concentration, persistence

or pace.[21] Regarding his residual functional capacity, Upton concluded that Wiltz had moderate

---

[17] Tr. 180.

[18] Tr. 150-154.

[19] Tr. 152.

[20] Tr. 155-178.

[21] Tr. 165.

limitations in his ability to understand and remember detailed instructions.[22] In connection with the Childhood Disability Evaluation Form, Upton concluded that Wiltz had a less-than-marked limitation in his ability to acquire and use information.[23]

On December 13, 2003, at the request of DDS, Wiltz was examined by Dr. John Canterbury, an internist.[24] Dr. Canterbury noted that Wiltz complained of headaches that are sometimes associated with blurred vision. The headaches last several hours and are relieved by prescription medication. Dr. Canterbury concluded that Wiltz had no exertional limitations. He should avoid loud noises, which according to Wiltz, tend to aggravate the headaches.[25]

### *School Records*

On May 12, 1999, St. Martin Parish Pupil Appraisal Services determined that Wiltz was learning disabled and placed him resource classes.[26] In October, 2001, Wiltz's teachers noted that his repeated medical absences from school adversely affected Wiltz even though he completed make-up work.[27] On November 28, 2001, it was noted that Wiltz was working about two years below grade level.[28] There were no behavioral concerns and it was noted that Wiltz was a well-mannered and polite student.

---

[22] Tr. 169.

[23] Tr. 175.

[24] Tr. 220-225.

[25] Tr. 225.

[26] Tr. 74.

[27] Tr. 97-102.

[28] Tr. 75.

## *Administrative Hearing*

Wiltz was unrepresented during the administrative hearing. Wiltz testified that his headaches start between his eyes and he becomes dizzy.[29] Once he gets a migraine, he takes his medication and stays in a dark room.[30] Wiltz estimated that some weeks he may have headaches every other day that require him to stay in a dark room.[31] He testified that smoke and dust aggravate his condition.

William Stampley, a vocational expert, responded to the ALJ's hypothetical questions regarding work available to someone with Wiltz's impairments:

> Q.  Would you assume that we have a hypothetical gentleman that's 18, and he's got – he stopped at the 12[th] grade, and is currently preparing for his GED. And he's got – has no past relevant work, and he has the following limitations. In his school testing he has IQ scores in the seventies. He has also been classified as having a learning disability, therefore, he would need a job that would be simple one and two-step starting at a (inaudible) position. And that he has a mild limitation in the activities of daily living and concentration, persistence, and pace. He would need a job that would have limited social interaction, and relatively lower type stress. Are there any jobs that you could identify that fit his (inaudible)?

> A.  Judge, I would submit several for your consideration, laborer stores is a medium unskilled position. . . . I would also submit hospital cleaner, it's a medium unskilled position, in the state 6,937, in the U.S. 393,189. I would also submit kitchen helper, it's a medium unskilled position . . . . Also there's some light possibilities, Judge, would be assembler of small products, light unskilled position . . . . I would also submit washer, hand is a light unskilled position . . . .

> Q.  All right. And of those jobs you just mentioned how many days a month would be tolerated by an employer for a person to miss work due to medical problems, say for example, because of headache?

---

[29] Tr. 234, 237.

[30] Tr. 234-235, 237.

[31] Tr. 241.

A.   Judge, probably no greater than three to 6.

Q.   Days a month?

A.   Right. Typically what happens, Judge.

HA:  Back on record.

VE:  A lot of companies structure sick leave such that people are allowed
     approximately 6 days of sick leave per year, once you utilize that sick leave, and
     have then used up any vacation and/or other time in lieu of it, and employer
     becomes pretty intolerant if an individual consistently misses work after that.

Q.   If you have someone who has missed say an average of 1, 2, and 3 days a week on
     a regular basis, would be tolerated?

A.   It would not be tolerated.[32]

## II.   **Finding of non-disability: Childhood Benefits**

Wiltz does not dispute the ALJ's finding that his impairments do not meet a Listed

impairment, however, Wiltz argues that the ALJ erred in not finding that he functionally equals a

Listed impairment due to the extreme limitations posed by his impairments.

Once it is determined that an impairment does not meet the requirements of a listed

impairment, the impairment is evaluated to determine whether it functionally equals an Appendix

1 listing. A medically determinable impairment or combination of impairments functionally

equals a listed impairment if it results in marked limitations in two of the following six domains,

or an extreme limitation in one domain:

    I.     Acquiring and using information;
    (ii)   Attending and completing tasks;
    (iii)  Interacting and relating with others;
    (iv)   Moving about and manipulating objects;
    (v)    Caring for yourself; and,

---

[32] Tr. 242-244.

(vi)     Health and physical well-being.

Title 20 C.F.R. § 416.926a(b)(1)(i-vi).

A "marked" limitation in a domain means an impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §416.926a(e)(2)(i).[33] A "marked" limitation is "more than moderate" but "less than extreme." Id. An "extreme" limitation will be found when an impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" within a domain. 20 C.F.R. §416.926a(e)(3).[34] An extreme limitation is "more than marked," but "does not necessarily mean a total lack or loss of ability to function." Id. Day-to-day functioning is considered to be seriously limited regardless of whether the impairment limits only one activity within a domain, or several.

---

[33] Title 20 C.F.R. §416.926(e)(2)(i) states as follows:

**(2) Marked limitation.**
(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

[34] Title 20 C.F.R. §416.926(e)(3)(i) states as follows:

**(3) Extreme limitation.**
(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

The ALJ concluded that Wiltz's impairments did not functionally equal a listed impairment:

> Based on the evidence of record and testimony at the hearing, the undersigned finds that the claimant has a less than marked limitation in the area of Acquiring and Using Information. School records indicate he is classified as having a learning disability and meets the criteria for resource classes. The consultative psychological evaluation revealed a verbal IQ of 79, a performance IQ of 73, and a full scale IQ of 74, indicative of functioning within the borderline range of subaverage general intellect with commensurate adaptive daily living skill development.
>
> In the domain of Health and Well-Being, the undersigned finds that the claimant has a marked limitation. He complains of continuing headaches and received homebound education per doctor's orders. However, there are no records of tests, hospitalizations, MRI's, brain scans, etc. to provide a basis for the complaints of headaches. The undersigned concludes that the doctor appears to rely heavily on the claimant's subjective complaints in reaching his conclusions.
>
> The claimant has no limitations in any of the following areas: Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, and Caring for yourself.[35]

Thus, the ALJ's determination ultimately centered around credibility determinations. Since Dr. Matis relied "heavily on the claimant's subjective complaints," and the record does not contain objective findings establishing the basis for the headaches, the ALJ determined that the fact that Wiltz's headaches resulted in homebound education was insufficient to establish an extreme limitation.

The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). Although the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, "the ALJ has sole responsibility for determining a

---

[35] Tr. 17.

claimant's disability status." <u>Martinez v. Chater</u>, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th cir. 1990). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." <u>Id.</u> quoting, <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987). The ALJ is certainly able to decrease reliance on treating physician testimony for good cause. <u>Leggett v. Chater</u>, 67 F.3d 558, 566 (5th Cir. 1995). "Good cause for abandoning the treating physician rule includes 'disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.'" <u>Id.</u>

The ALJ's insistence upon objective medical evidence of Wiltz's migraine headaches was error. Migraine headaches are particularly unsusceptible to diagnostic testing. <u>See, e.g.</u>, <u>Ortega v. Chater</u>, 933 F.Supp. 1071, 1075 (S.D. Fla. 1996) (present-day laboratory tests cannot prove the existence of migraine headaches); <u>McCormick v. Secretary of Health and Human Services</u>, 666 F. Supp. 121 (E.D. Mich. 1987) (migraine headaches not traced easily to an objective medical condition), <u>aff'd</u>, 861 F.2d 998 (6th Cir. 1988). The <u>Ortega</u> court noted that, while laboratory tests cannot prove the existence of migraine headaches, there are medical signs which should be viewed as "objective evidence."

> While it is true that Dr. Trueba did not cite to any laboratory tests confirming the existence or the severity of Ms. Ortega's migraine headaches, she did set forth the medical signs and symptoms sufficient to justify the diagnosis and treatment of migraine headaches. *Included among the signs and symptoms suffered by the Plaintiff are nausea, vomiting, photophobia, dizzy spells, and black outs. (citation to record omitted). Many of these symptoms are, in fact, medical signs which are associated with severe migraine headaches. Since present-day laboratory tests cannot prove the existence of migraine headaches, as is also the case with many psychiatric and psychological impairments, these medical signs are often the only means available to prove their existence.* [citation to <u>Sisco</u> omitted]. The signs often begin as symptoms which, when analyzed by a physician or psychologist, can point out identifiable elements of a specific

> impairment. ***In the present case, nausea and vomiting were the medical signs analyzed to determine the existence of migraine headaches. Without these medical signs, it would be impossible to diagnose or treat migraine headaches for any patient.*** Therefore, the ALJ should not have discounted Dr. Trueba's opinion since she has been Ms. Ortega's sole treating physician on more than 41 occasions since August, 1989 and can confirm the existence of these migraine headaches.

933 F.Supp. at 1075 (emphasis added).

Thus, in cases involving complaints of disabling pain due to migraine headaches, courts look to other objective medical signs to determine whether the claimant's complaints are consistent with the existence of disabling migraine pain, including whether the claimant's migraines are accompanied by drowsiness, dizziness, nausea, vomiting and blurred vision, whether the claimant has been prescribed medication for migraines and the associated symptoms of nausea and vomiting, whether the plaintiff is sensitive to light (photophobic) or sound, whether the claimant has received continuing and regular treatment for migraines – including outpatient and emergency treatment – and whether the claimant's symptoms are consistent with those of migraine headaches. See Newman v. Chater, 1997 WL 327091, *5 (D.Kan. 1997) (ALJ's finding of non-disability reversed where undisputed evidence showed that the answers to the all of the aforementioned questions were positive); Francois, 2001 WL 322194, at *12; Kriebel v. Massanari, 2001 WL 544013, at *1 (E.D. Pa. 2001).

The record shows that Wiltz has consistently sought treatment for migraines. The record further shows that he was prescribed medication for this condition. Additionally, Wiltz told Dr. Snatic that his migraines sometimes result in vomiting, and he testified that once he gets a migraine he becomes dizzy and must stay in a dark room until the headaches is gone.

Thus, the undersigned concludes that the ALJ erred in disregarding the diagnosis of Dr. Matis on grounds that there were no "tests, hospitalizations, MRI's, brain scans, etc." to support it.[36] It is clear that Wiltz's headaches rendered him incapacitated and prevented him from attending school on a regular basis. Since his headaches limited him from day-to-day functioning in a school environment, the undersigned concludes that Wiltz's had an extreme limitation in the domain of "health and well-being." 20 C.F.R. §416.926a(e)(3). Accordingly, the ALJ erred in not finding that Wiltz was entitled to childhood disability benefits because his impairments functionally equaled a Listed impairment

## III.     Finding of non-disability:  Adult Benefits

Wiltz argues that the ALJ's finding that he is not entitled to adult benefits is not supported by the record because the ALJ's hypothetical question to the vocational expert was incorrect, and because Wiltz was denied due process of law regarding his waiver of right to counsel and inspection of post-hearing evidence. Even if the undersigned finds merit in these arguments, the appropriate remedy would be to remand the case for additional administrative proceedings allowing Wiltz the benefit of counsel, inspection of all evidence, and to obtain additional vocational expert testimony. Remand is not necessary, however. As discussed above, the undersigned concludes that the ALJ's decision to discount Dr. Matis's opinion was erroneous. As set forth below, the same analysis applies to the ALJ's decision to discount Wiltz's credibility, and therefore, the ALJ erred in finding that Wiltz was not entitled to adult disability benefits.

---

[36] Tr. 17.

The ALJ discounted Wiltz's allegations regarding the limitations posed by his headaches:

> The claimant testified that he has had migraine headaches for four years and due to frequency of absences from school he has been schooled though homebound services from the ninth to the twelfth grade. His treating physician is of the opinion that the claimant is incapacitated by his disease. However, the records document no test, hospitalizations, MRIs, brain scans, etc. to provide a basis for the complaints of headaches, and the undersigned feels that his physician relies heavily on the claimant and his mother's subjective reports of symptoms and limitations, and sem to accept as true most, if not all, of the complaints. Additionally, the medical records from Dr. Matis contain a report dated August 22, 2001 indicating a school physical for football in which the doctor indicated normal exam-sports. Furthermore, the claimant's daily activities further suggest that he is capable of performing at least some work activity. He does schoolwork, homework, shops, and drives occasionally, plays video games, listens to music, plays basketball and football when he can, does some household chores, and mows the lawn when he feels well enough. Considering the evidence, testimony and above referenced criteria the claimant's complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone. The Administrative Law Judge finds the claimant's subjective complaints are credible only to the extent they are consistent with the objective medical evidence and the conclusions stated therein.[37]

Just as with his opinion regarding Dr. Matis, the ALJ's credibility determination with respect to Wiltz was rooted in the fact that the medical records do not contain objective medical tests supporting Wiltz's allegations of headaches. As discussed above, however, disability due to migraine pain does not require objective medical testing such as MRIs, or brain scans. Rather, objective medical signs such as vomiting, dizziness, and light sensitivity are considered sufficient medical signs to support migraine pain. Wiltz has a well-documented history of complaints of severe headache pain, the pain was accompanied by vomiting, and he testified that he gets dizzy and avoids light while he has a headache. The fact that his physician found him physically fit to

---

[37] Tr. 21.

play football and that he does engage in physical activities has no bearing on whether he has frequent and incapacitating migraine pain.

Moreover, Wiltz testified that he sometimes suffers from migraine pain every other day and during these episodes he spends his day in a dark room. The evidence shows that Wiltz was unable to attend school because of his repeated migraines and there is no evidence that if he obtained employment he would not be forced to be absent frequently due to continuing headache pain. In fact, the Wiltz's inability to engage in sustained activities is supported by Dr. Matis's opinion that Wiltz's migraines "have progressed to the point of substantially limiting his activities . . . and for the foreseeable future, he is incapacitated by his disease."[38]

In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a realistic work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." Id. at 831.

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

The overwhelming evidence of record shows that Wiltz's condition is of a chronic and severe nature, which prohibited him from attending school and would likewise cause him to be frequently absent from work. Considering this, and the fact that the vocational expert testified that employers would not tolerate an employee's frequent absences, the undersigned finds that the ALJ's determination that Wiltz could perform work that exists in significant numbers is not supported by substantial evidence.

---

[38] Tr. 180.

19

## *Conclusion*

Considering the foregoing, it is recommended that case be **REVERSED** and that plaintiff be awarded childhood benefits from March 20, 2002[39] through February 25, 2003 (the date he attained the age of eighteen) and adult benefits consistent with an onset date of February 25, 2003.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana on ___February 7___, 2006.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

---

[39] *See* 20 C.F.R. § 416.335 for computation of onset date for childhood benefits.